```
 1                IN THE UNITED STATES MAGISTRATE COURT
                     NORTHERN DISTRICT OF INDIANA
 2                        HAMMOND DIVISION

 3

 4

 5   UNITED STATES OF AMERICA,

 6      vs.                          2:14-MJ-127

 7   KEVIN FORD and
     CORTEZ STEVENS,
 8
        Defendants.
 9

10

11

12        TRANSCRIPT OF PROBABLE CAUSE AND DETENTION HEARING

13             BEFORE THE HONORABLE JOHN E. MARTIN

14                  UNITED STATES MAGISTRATE

15                    HAMMOND, INDIANA

16                    OCTOBER 30, 2014

17

18

19

20

21

22

23

24   Proceedings recorded via CD.  Transcript produced by

25   computer-aided transcription.
```

1               A P P E A R A N C E S

2

3   FOR THE GOVERNMENT:

4           Diane Berkowitz
            U.S. Attorney's Office
5           5400 Federal Plaza, Suite 1500
            Hammond, IN 46320
6           (219) 937-5500

7

8   FOR THE DEFENDANT:

9           Scott L. King
            Scott King Group
10          9211 Broadway
            Merrillville, IN 46410
11          (219) 769-6300

12

13  Kevin Ford and Cortez Stevens, Defendants, present in person.

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1              THE COURT:  We are here in the matters of United
 2   States of America against Kevin Ford, and United States of
 3   America vs. Cortez Stevens, 2:14-MJ-127.  Both defendants are
 4   appearing by counsel, Scott King.
 5        Good afternoon, Mr. King.
 6              MR. KING:  Good afternoon, Your Honor.
 7              THE COURT:  And the Government is appearing by its
 8   assistant United States attorney, Diane Berkowitz.
 9        Hello, Ms. Berkowitz.
10              MS. BERKOWITZ:  Hello, Your Honor.
11              THE COURT:  We are here today for the purpose of a
12   probable cause/detention hearing on both matters.
13        Mr. King, is it okay to proceed with both matters at the
14   same time?  And you can address the issues with regard to each,
15   or do you want me to --
16              MR. KING:  No, that's fine.
17              THE COURT:  -- separate them?
18              MR. KING:  No.  We can proceed with both at the same
19   time.
20              THE COURT:  Okay.  Is that all right, Ms. Berkowitz?
21              MS. BERKOWITZ:  Yes.
22              THE COURT:  All right.  The Court has received and
23   reviewed pretrial services reports on both Mr. Kevin Ford and
24   Mr. Cortez Stevens.  And to the extent that those reports are
25   not refuted by the evidence or by objection of either part, I
```

 1    will consider the information in each of those in making

 2    determinations with regard to bond.

 3         Is that all right with the Government?

 4              MS. BERKOWITZ:  That is, Your Honor.

 5         We do have reservations about the completeness of the

 6    information as contained within the bond report.

 7              THE COURT:  Well, these were sent within a couple of

 8    days, and they do a good job of putting together what they can.

 9    But, obviously, if there's something to supplement it.  But to

10    the extent that it's available, I'll utilize that, if that's

11    okay?

12              MS. BERKOWITZ:  Yes.

13              THE COURT:  All right.

14         Mr. King, is that okay with the Defense?

15              MR. KING:  That's fine, Judge.

16              THE COURT:  All right.

17         Is there any agreement with regard to bond with regard to

18    Mr. Kevin Ford --

19              MS. BERKOWITZ:  There is not.

20              THE COURT:  -- from the Government?

21         Okay.  With regard to bond for Mr. Cortez Stevens?

22              MS. BERKOWITZ:  There is not.

23              THE COURT:  Okay.  So we'll have bond hearings.

24    Okay.  That's fine.

25         The Government has the burden.  So, Ms. Berkowitz, you can

```
 1    go first.  Do you have any witnesses, proffers, or evidence
 2    that you wish to submit?
 3                MS. BERKOWITZ:  Your Honor, we would proffer our
 4    evidence.
 5                THE COURT:  Okay.  Which is fine.
 6                MS. BERKOWITZ:  I would start with Kevin Ford, if I
 7    may.
 8         Would you prefer that I remain here, or would you like me
 9    to be at --
10                THE COURT:  Oh, you can remain seated, and that's
11    absolutely fine.  And, Mr. King, you may as well.
12         You can go to the podium, or you can remain seated when
13    you make any presentations.
14                MS. BERKOWITZ:  As a preliminary matter, I would
15    note, Your Honor, that as the complaint, which has been
16    disclosed to defendant, makes clear, the defendants used social
17    media and computers to perpetuate a criminal activity.  I
18    notice in the bond report that there is no restriction placed
19    on these defendants, whether use of the Internet or access to
20    social media.  And at the very least, what I would ask the
21    Court to consider for these defendants is that the probation
22    department has complete and unfettered access to their Facebook
23    and any Instagram that they use, or any other social media that
24    the defendants use; and that, additionally, defendants be
25    prohibited from opening up any other social media accounts
```

 1    under any other names or aliases, and that that be something

 2    that is part of, at the very least, their supervised release

 3    pretrial.

 4        With respect to Kevin Ford, we would submit that this

 5    defendant still poses a danger to the community.  And I have

 6    some evidence I would like to present to the Court.

 7            THE COURT:  That's fine.

 8        Is this going to be exhibits?

 9            MS. BERKOWITZ:  They are, Your Honor.

10        And I've shown them to counsel prior to the hearing.

11            THE COURT:  So, Mr. King, you've seen these exhibits?

12            MR. KING:  I've seen them.  I'm not stipulating to

13    their admissibility.

14            THE COURT:  Okay.

15            MS. BERKOWITZ:  Your Honor, as counsel is aware, the

16    Rules of Evidence do not apply at a detention hearing.

17        Your Honor, I proffer and place into evidence Ford Exhibit

18    No. 1, which is a Facebook posting that Government agents

19    obtained through a review of Defendant Kevin Ford's Facebook

20    account.  There is no privacy restriction on here.  It

21    identifies as "bandmankevo."

22        And as you can see, on October 20th of this year, he

23    states in his posting, "Fuck a cop.  Fuck a fed.  Fuck 'em all.

24    Fuck 'em all.  Kill 'em all like they will do to you."

25            MR. KING:  I'm going to object to the

1    characterization of him having posted.  The exhibit itself

2    leads with "bandmankevo shared Shawn Cush's video."

3        I think it's complete misrepresentation by the Government

4    to suggest these were words at any point iterated in any form

5    by my client.

6            MS. BERKOWITZ:  Your Honor, I think you can listen to

7    the video that's attached that defendant makes part of his

8    Facebook posting.  Those words are not in that video.

9            THE COURT:  Can I see the -- whose picture is in the

10   purported video that could be clicked on and then played?  Is

11   that email --

12           MS. BERKOWITZ:  I believe that's Shawn Cush, Your

13   Honor.

14           THE COURT:  Okay.  But the Government is representing

15   that the words that are above the video are not in the song if

16   that were to be played?

17           MS. BERKOWITZ:  Right.  These are -- this is a

18   posting by the defendant.

19           THE COURT:  Mr. King, do you want me to listen to the

20   song, or can we accept that on its face?

21           MR. KING:  I'm sorry.  What?

22           THE COURT:  Do you want me to listen to the song, or

23   can we just accept that on its face, that -- I don't know if

24   that's in the lyric or not.

25           MR. KING:  If, at the conclusion of the evidence in

1    the case, the Court feels that there's a close enough question

2    to warrant listening, then, yes.  But in terms of our

3    proceeding today, just -- you know, since we're just proffering

4    exhibits here, I want the record to be clear that what the

5    actual exhibit here is stating.

6         THE COURT:  And you can do that by form of an

7    objection, or you can point that out to me because you should

8    have access to these as well.

9         MR. KING:  Okay.

10        THE COURT:  So you don't necessarily need me to

11   listen to it, then, Ms. Berkowitz, as well?

12        MS. BERKOWITZ:  Your Honor, of course, is welcome to

13   listen to it.  I listened to it.  I did not hear those words in

14   there, but --

15        THE COURT:  Sometimes it can be hard to decipher, but

16   it looks like there's a written posting.  Then there's a link

17   to this video.  So I'll take it for what it's worth.  And I

18   think if I need to listen to it, I will.

19        MS. BERKOWITZ:  And so I'm offering into evidence

20   Ford No. 1, Your Honor.

21        THE COURT:  Is there an objection, Mr. King?  I mean,

22   you had already objected.

23        MR. KING:  Yes.  I'll reiterate my objection.

24        THE COURT:  All right.  I'm going to overrule the

25   objection and allow it in and the weight and where things came

9

```
1   from.  Then the Defense can point out why that shouldn't be
2   relevant in their own presentation.
3           MS. BERKOWITZ:  Your Honor, I would also proffer into
4   evidence photographs that law enforcement officers were able to
5   download off of Facebook, off of the defendant's Facebook
6   pages.  I am going to proffer that the following photographs
7   are of the defendant, Kevin Ford, off of his Facebook page.
8       I'm going to show you what's been marked -- and I've shown
9   it to Defense counsel -- as Ford Exhibit 2.  This is a
10  photograph of the defendant with a gun tucked into the
11  waistband of his pants.  And I would just note, Your Honor,
12  that this particular gun has a very light-colored body to it.
13  And this is a posting that was made on September 27 of 2012.
14  It shows uploaded on Ford Exhibit 2.  And I would offer Ford
15  Exhibit 2 into evidence.
16          THE COURT:  Any objection, Mr. King?
17          MR. KING:  Relevance.  (Inaudible.)
18          THE COURT:  All right.  I'll overrule it.  But,
19  again, the relevance and the weight is always up for argument.
20          MS. BERKOWITZ:  I also show the Court and offer into
21  evidence Ford Exhibit 3, which is another Facebook posting.
22  This is from 10-8 of 2012.  This is from Kevin Ford's Facebook
23  page.  And, again, we see a picture from his page, which we
24  believe is Kevin Ford, with a gun, a different kind of gun,
25  dark-colored body that appears tucked in the waistband of the
```

1    defendant's pants.

2         We would offer Ford Exhibit 3 into evidence.

3              THE COURT:  Same objection, Mr. King?

4              MR. KING:  Was the indication made as to the date of

5    the photograph?

6              THE COURT:  It was in 2012.

7              MR. KING:  Same objection.  Irrelevant as to both

8    issues before the Court.

9              THE COURT:  All right.  It's overruled.  I will

10   accept it.

11             MS. BERKOWITZ:  And I'd offer into evidence Ford

12   Exhibit 4, which is another Facebook posting on this

13   defendant's Facebook page dated July 8 of 2013.  This is a

14   photograph.  The agents, if they were called to testify, Adrian

15   Johnson and Carrie Holter would testify that they met this

16   defendant before.  This appears to be a photograph of him.

17   It's on his Facebook page.  And on this paragraph, you can see,

18   Your Honor, there's a gun sitting on the counter right next to

19   the defendant.

20        We would offer into evidence Ford Exhibit 4.

21             THE COURT:  That was from 2013, I believe?

22             MS. BERKOWITZ:  It is.  July 8th of 2013.

23             THE COURT:  Same objection, Mr. King?

24             MR. KING:  Yes.

25             THE COURT:  And the same ruling.  I will accept it

1    into evidence.

2            MS. BERKOWITZ:  I would also offer into evidence a

3    posting from the defendant's Facebook page, bandmankevo, which

4    was made 38 weeks ago, in 2014.  And this is Ford Exhibit 5.

5    This is a photograph of the defendant pointing a gun at the

6    camera.

7        We would offer Ford Exhibit 5 in evidence.

8            THE COURT:  Objection, Mr. King?

9            MR. KING:  Same objection.

10           THE COURT:  Same ruling.  It will be accepted.

11           MS. BERKOWITZ:  The Government would also offer into

12   evidence Ford Exhibit 6, which is another Facebook posting off

13   of defendant bandmankevo's Facebook website.  That was posted

14   35 weeks ago in 2014, and this is a photograph of two firearms.

15           THE COURT:  Objection, Mr. King?

16           MR. KING:  Same objection.  Relevance.

17           THE COURT:  All right.  It will be accepted into

18   evidence.

19           MS. BERKOWITZ:  We'd also proffer, Your Honor, that

20   the defendant -- we rely on the complaint certainly in this

21   case, which outlines the defendant's extensive criminal

22   activity involving cracking cards, but it would appear that the

23   defendant continues engaged in criminal activity.

24       We have contacted the defendant's landlord, Cindy

25   Petrozik, I believe, is her last name.  And she provided to the

1    Government, to Agent Halter and to Agent Johnson, the rental

2    application that was submitted by the defendant as well as an

3    alleged credit report, criminal history that appears to contain

4    significant false information.  I would offer to the Court Ford

5    Exhibit 7, which is the rental application the defendant

6    submitted for lease agreement on the 60 East Monroe in Chicago,

7    Illinois.  And that application is dated April 8th of 2014.

8         I would note -- I'm sorry.

9              THE COURT:  So are you offering this into evidence?

10             MS. BERKOWITZ:  I am offering it into evidence, Your

11   Honor.

12             MR. KING:  I'm going to object.  This is completely

13   irrelevant.  Even assuming for the sake of argument, which I

14   don't, but for the sake of argument that every letter and every

15   number in there is a complete falsehood, it does not bear on

16   the issue of probable cause in this case nor in any way, shape,

17   or form the issue of detention.

18       The stated basis for the Government's motion for detention

19   is the defendant presenting a present threat of danger as

20   articulated in 18 U.S.C. 3142.  There is nothing in this

21   document that is in any way, shape, or form probative of that

22   issue.

23       You know, this isn't a let's put on evidence of either or

24   both of these individuals being bad guys.  It's should they

25   be -- is there no condition of pretrial release that will

1    satisfy a legitimate concern of safety of particular people or

2    a risk of flight.

3         Now, the Government has raised this simply as a danger.

4    How in heaven's name is this in any way, shape, or form

5    probative of that issue?  It's not.

6              THE COURT:  Ms. Berkowitz.

7              MS. BERKOWITZ:  Your Honor, actually, the wording of

8    the 3142(f)(2) is no condition exists that would reasonably

9    assure the safety of another person or the community.

10        Certainly committing or continuing to commit other

11   criminal acts poses a danger to the community.

12        This defendant has consistently, despite the fact that in

13   2012 he was contacted by law enforcement, despite the fact that

14   he gave up his Maserati, was forfeited to the Government as a

15   result of his conduct, he continued to engage in criminal

16   conduct.  And I submit, if I'm able to continue to explain this

17   document, he's continuing to do it today.

18        On his application that he submitted to -- for the lease

19   on 60 East Monroe, he identifies a false Social Security

20   number.  That's not his Social Security number.  Those last

21   four digits, not his number.  The defendant never would've

22   qualified for this apartment.  And if I can go through the

23   other items that pertain to this lease application, or rental

24   application he submitted, it becomes very clear why this is

25   relevant.  You have to look at the defendant and his behavior

1    and how he -- how he conducts himself.  That is part of the

2    analysis here.  And this defendant, I don't believe, the

3    Government does not believe, can abide by the rules and

4    regulations that this Court would impose short of keeping him

5    in jail.

6        He does not -- there are no conditions that would

7    reasonably assure the safety of the community (inaudible) this

8    defendant would not continue to engage in the conduct that

9    we've charged him with in the complaint.

10        In this -- as I indicated in Ford 7, which I offered into

11   evidence, the defendant has a false Social Security number, and

12   he also identifies employment.  He shows -- he identifies

13   Showtime Entertainment as his employer.

14        Your Honor, I would proffer to the Court that -- and it

15   appears in the affidavit, which counsel is well aware of --

16   that the Government has looked at Workforce Development records

17   for Indiana and Illinois for the past two years, and there is

18   no record of this defendant holding a job and working.

19            THE COURT:  All right.

20        Well, Mr. King, last --

21            MR. KING:  Briefly respond.  Under (f)(2) of 18

22   U.S.C. 1342, it has to be a serious risk that the person will

23   either flee or obstruct, or attempt to obstruct justice, or

24   threaten, injure, or intimidate, or attempt to threaten or

25   intimidate a prospective witness or juror.

1        That's the language of the statute.  And it's not just

2   some generalized notion that any individual might, during the

3   period of time from charging until trial, maybe commit another

4   offense based on speculation on a document from April of 2014.

5   It simply isn't relevant to the issue.

6        THE COURT:  Well, I believe that I'm -- I can parse

7   through, and the Government can argue, and the Defense can

8   argue what portions that this may or may not be relevant to the

9   issue with regard to bond.  Obviously, a lot of it wouldn't be.

10  That, in combination of other things, may be relevant.  So I am

11  going to allow the exhibit into evidence for that purpose, but

12  then everyone is free to argue which portions of that should or

13  shouldn't apply, and then I'm very well able to read through it

14  and find what is relevant.  And then the Government does

15  indicate it has some more things that will tie it up.  So I'll

16  look at that as well.  So I will accept it into evidence.  How

17  much weight it gets, I'm not so sure, but I will accept it into

18  evidence.

19        MS. BERKOWITZ:  Your Honor, I'm showing the Court

20  what I've offered into evidence and has been marked and shown

21  to Defense counsel as Ford A and Ford B.  And these are alleged

22  paystubs that were provided to the landlord from whom this

23  defendant is renting the condominium at 60 East Monroe.

24        THE COURT:  Mr. King, would it be the same

25  generalized objections, or do you have something more specific

 1    you would like to say with regard to these two?

 2            MR. KING:  The same specifically generalized

 3    objection as to relevance.

 4            THE COURT:  Correct.  Overruled.  I'll accept them

 5    into evidence, and I'll decide the weight.

 6            MS. BERKOWITZ:  Your Honor, again, this indicates

 7    that the defendant -- this is a paystub that's provided to

 8    someone to obtain something of value, in this case, the rental

 9    of a condominium in Chicago.  He identifies that he is working

10    for Showtime Entertainment clearly as an employee because

11    Social Security taxes are being taken out.  Taxes are being

12    taken out.  And, again, Your Honor, as I noted earlier and

13    appears in the complaint, there's no record of Workforce

14    Development of this defendant being employed anywhere for the

15    past two years.  So this is not correct.

16        The landlord has indicated that with proper -- that the

17    landlord has indicated that she's paid by the defendant through

18    money orders.  Again, that is part of the scheme that we've

19    seen in this case, in the cracking credit cards case, where the

20    defendant takes the fraudulent checks, deposits them, and then

21    pulled the money out through money orders, or PayPal; and that

22    the defendant is paying about $4,300 a month in rent for an

23    apartment where he has no source of income.

24        Finally, we have what was provided to the landlord as Ford

25    Exhibit No. 9, which purports to be a credit report for the

1    defendant showing that the defendant has very good credit.

2    Under Equifax, he allegedly has an 801.  I think the highest

3    score, Your Honor, is 860 or 890.  This defendant has no known

4    source of employment, and yet he somehow has a credit report

5    that doesn't have his Social Security anywhere to be found on

6    it, and he's got a credit scale of 801.  That's impossible.

7    These were all made-up names, which the defendant has done

8    previously.  These are just made-up records that he's somehow

9    been able to convince the landlord to accept and believe as

10   true.  She didn't double-check it.  She relied on the realtor

11   who submitted this on the defendant's behalf, and they're

12   false.

13        Additionally, as far as obstruction goes, this defendant

14   was incarcerated, as counsel pointed out, in the initial

15   appearance in Plymouth, Indiana.  And at that incarceration, or

16   during that incarceration, the defendant, the Government would

17   proffer, made some jail calls with his then-girlfriend Mercedes

18   Hatcher where he directed her.  And there is, actually, a

19   search warrant, affidavit that is part of his record, Your

20   Honor, from, I believe, 2012, that the Court can take judicial

21   notice of that outlines all those conversations where the

22   defendant, as well as Mr. Cortez Stevens, directed Ms. Hatcher

23   to do certain things with evidence that's back in their

24   apartment.

25        So the Government is concerned that these defendants,

1    without any limitations being placed on them, and, certainly,

2    as the Government reads the file report that presently exists

3    for these defendants, there are no limitations that are placed

4    on them that would adequately protect the community from their

5    continued criminal conduct, particularly Mr. Ford's criminal

6    conduct.

7        I can address Mr. Cortez Stevens now, if you want, or

8    would you like to wait on that one?

9            THE COURT:  Mr. King, would you like her to address

10   Mr. Cortez Stevens and then --

11           MR. KING:  Yeah.  We can do both of them.

12           THE COURT:  You can go forward with Mr. Cortez

13   Stevens as well.

14           MS. BERKOWITZ:  With Mr. Stevens, Your Honor, I would

15   proffer --

16           THE COURT:  Just are there any exhibits?

17           MS. BERKOWITZ:  There are no exhibits for

18   Mr. Stevens.

19           THE COURT:  Okay.

20           MS. BERKOWITZ:  With Mr. Stevens, I would proffer

21   that, at the time of his arrest, in plain sight, we found check

22   stock, a huge box of check stock, check stock and a printer.

23   We have obtained search warrants for the laptop that was there

24   attached to the printer.  We've seized the check stock.

25   Clearly this defendant continues to engage in -- there's no

1   reason why this defendant, who has no known source of

2   employment, would have boxes of check stock.  That is, again,

3   consistent with the criminal activity that's been charged in

4   this complaint.

5       The defendant is charged with creating these phony checks

6   that get deposited into a bank account and taking all the money

7   out of the bank account before the bank realizes what's

8   happening.  And they do that by creating phony checks, using

9   the check stock, as we've outlined in the affidavits in the

10  complaint.  And here we have, in 2014, Defendant Cortez Stevens

11  in his bedroom and in plain sight, the check stock, check stock

12  in the printer hooked up to the laptop, all consistent with

13  defendant's prior conduct.

14      Your Honor, we would ask that these defendants be detained

15  because there is no -- we're not aware of any method by which

16  we can assure the safety of the community or prevent the

17  defendants from engaging, continuing to engage in criminal

18  conduct short of them being incarcerated.

19          THE COURT:  All right.  Thank you, Ms. Berkowitz.

20      Mr. King, do you have any proffers or evidence?

21      Well, let me look at any witnesses.  Do you have any

22  witnesses?

23          MR. KING:  I don't have any witnesses.

24          THE COURT:  All right.  Then proffer?

25          MR. KING:  Yes.  By way of proffer.

 1        First of all, with respect to assertion by the Government

 2   that -- regarding Ford -- that, as I understood it, perhaps I

 3   misunderstood, no legitimate source of income.  Right in the

 4   bond report it's indicated he is -- has been for four years a

 5   rap artist, that most recently his last month's of earning.

 6   During this month, his earnings were $6,000.  And referenced on

 7   page 2, he was paid in cash only.

 8        I will proffer that musicians of, quite frankly, most any

 9   description are not unusually paid in cash.

10        Now, there may be issues pertaining to tax liability and

11   all that, but that's not before the Court.

12        So the suggestion that because we don't have any reports

13   or any discernible records in the Workforce Development

14   pertaining to him, worse that he must be getting this money

15   illegally, is just not true.  And the rap artist relates to

16   virtually every one of those photographic exhibits.

17        First of all, the language which they referenced in

18   their -- in the criminal complaint, the language about F'ing a

19   fed and all this other business, several points on that.

20        To their credit, even in the complaint, they list the --

21   they list out the language with slashes in between the lines to

22   denote this is a verse.  This is a -- this is poetry written in

23   prose as they prepared the affidavit.

24        And, in fact, on the photograph, that's how it's --

25             THE COURT:  Do you have the page?

1           MR. KING:  Yeah.  I knew you were going to ask me

2      that.

3           THE COURT:  If you're going to bring it up, I'm going

4      to want to look at it.

5           MR. KING:  Okay.  It's page 10, paragraph 28.

6      Now, what's referenced in the complaint is law enforcement

7      also notes that Monday, October 20th, 2014, Ford posted the

8      following on his Facebook wall:  "F a cop/F a fed.  F them all.

9      Kill them/all like they will do you."

10     Now, that's what's referenced in the complaint that he

11     posted, what he did, but he didn't write it.

12          THE COURT:  So that was the -- that's what was on the

13     top, and then there was a link to a video.

14          MR. KING:  Exactly.  And our contention is he had, in

15     the video, as is another performance artist, rap artist, who is

16     opining his points of view regarding the Ferguson, Missouri,

17     episode where a young man was killed by a police officer and

18     voicing a complete lack of approval of the police conduct in

19     that case, and it was from there that he, this man, is sharing

20     it on his Facebook page.  And we're contending that the

21     language that came from that is what was posted.  He is a rap

22     artist, and this is critical.  It's critical on all these

23     pictures.  Every one of these pictures.  And you can see every

24     one of them is a posed shot.  These are not candid shots of

25     this man next to a gun, with a gun, or with a gun in his belt.

22

1    These are posed shots.   Posed for what purpose?   Posed for the

2    persona, the image that is cultivated by many, if not most, rap

3    artists, whether we personally agree or disagree, anything like

4    that, that's what they do.

5         So the proffer regarding all of these exhibits, these

6    photographic exhibits, is that these are, in this day and age,

7    promotion of the role as a rapper.   "I'm a bad guy.   I've got

8    guns, and I've got" -- you know, I'm not a big fan of rap.

9    I've heard enough of my children and my grandchildren now,

10   that's what this is, and it is not in any way significantly

11   probative of the Government's contention.

12        With respect to -- so for four years he has been earning a

13   living as a rapper.   He has a number, a number of postings on

14   YouTube accessible and downloadable through iTunes.   My office

15   staff, beginning this morning, began going through that

16   process.

17        In fact, he has -- he is developing a bit of notoriety, a

18   bit of popularity as a performing rap artist.   And, again, none

19   of those guns, none of those guns were anything other than

20   props for promotional purposes.   It's kind of born out in

21   significant measure in the report by probation regarding his

22   prior criminal history.

23             THE COURT:   Which part?   We're still talking about

24   Mr. Ford, correct?

25             MR. KING:   Yes, I am, sir.

1        In terms of -- we have a -- traffic, traffic, traffic.

2    The bottom of page three is the Marshall County, Plymouth,

3    Indiana, state court matter that's now been incorporated into

4    the charges here that I represented them on and was dismissed.

5        The only other thing beside that traffic is the

6    November 17th, 2012, showing a release without charging on

7    first degree murder, and that was literally a release that

8    occurred in less than 24 hours.  A friend of his was killed.

9    The police rounded up a number of people for questioning.  They

10   held him briefly to accommodate the questioning, and that's

11   what happened.  There was no (inaudible).

12       So I believe, and our proffer is, that the context of the

13   exhibits the Government has put forward has to be in terms of

14   his career as a rap artist, and that is the context in which

15   the Court -- the Court should view it.

16       Mr. Stevens, you have before you the report, and we have

17   no additions, objections to it.

18       Just by way of clarification on the mental health status,

19   there was, coincidental to his leaving high school, there was

20   an initial diagnosis of depression.  There has been no history

21   of treatment.  There has been no -- any kind of critical

22   recurrence or any kind of symptomology that's compromised him

23   in any way.  That would be the proffer by the Defense in this

24   case.

25       The other proffer I wish to make is during the pendency of

1 the prosecution in Marshall County, Indiana, in 2012, a couple

2 of points salient to that.  First of all, both defendants, then

3 I think both residents, I don't know if it was Merrillville or

4 still in Illinois when the case started, they both posted bonds

5 in Marshall County.  They both had an impeccable record of

6 court appearances during the pendency of the case which

7 included an evidentiary hearing on defendants' motion to

8 suppress.  That was their track record that I'm personally

9 aware of.

10   Secondly, it was -- even before the dismissal of that

11 case -- that it became obvious that federal agents were

12 engaging in at least some initial form of investigation in this

13 matter because on one occasion, when there was a court

14 appearance for these two young men in Marshall County, agents

15 of the FBI were observed parked in the immediate proximity to

16 the courthouse and appeared to follow the young men as they

17 left to return back to their residence.

18   The relevance of that proffer is they have been completely

19 aware, not only from their own experience but the benefit of my

20 counsel, that they have been under investigation for

21 approximately three years for the conduct.  Neither of them in

22 any way, shape, or form has attempted to leave the

23 jurisdiction, to leave -- I mean, crossing the line into

24 Chicago I hardly think of as fleeing the jurisdiction.

25   I want to make the Court aware of those facts.

1         The other proffer I have is this morning, arrangements

2    were made with the FBI on behalf of Mr. Stevens for the

3    lawfully possessed firearm at his residence to be retrieved by

4    an agent of the FBI, whose handwriting I can't read, but did

5    obtain a receipt for it, and I think the Government

6    acknowledges that that gun has been obtained.

7              THE COURT:  And that was the weapon we spoke of two

8    days ago?

9              MR. KING:  That was the weapon we spoke of two days

10   ago.

11             THE COURT:  Does the Government -- are you aware,

12   Ms. Berkowitz?

13             MS. BERKOWITZ:  We are aware, Your Honor, that with

14   respect to Mr. Stevens, that the gun was turned over by his

15   girlfriend, and we do have possession of that right now.

16             THE COURT:  Okay.

17             MS. BERKOWITZ:  With respect to the guns that are

18   owned by Kevin Ford, we don't have anything.

19             MR. KING:  And I was going to get to that.

20             THE COURT:  Okay.

21             MR. KING:  In discussion with Mr. Ford, I proffer

22   that there -- he has no direct or constructive possession of

23   any form of firearm.  Verification of that, I'm open to

24   suggestions how that can be done.  Of course, with him being

25   detained, I've had no opportunity to personally search his

1   residence.  In (inaudible) that, I'm open to suggestions of how

2   that can be accomplished because, regardless, you know, if the

3   Court sees fit to release them, it is a condition, and they're

4   aware of it being a condition.  You can't be in possession,

5   have access to, any form of firearm.

6       But the representation is made, and this is part and

7   parcel of those photographs of him with guns spanning back over

8   years.  Being mere props, there are no weapons present in his

9   residence or otherwise under his -- under his control.

10      I'm not trying to be weasely of the wording, but he just

11  doesn't -- he doesn't possess any weapons.

12      So that would be the proffers in light of the evidence,

13  the proffers that have been made by the Government here.

14          THE COURT:  All right.  Thank you, Mr. King.

15      Ms. Berkowitz, any further proffers or argument?

16          MS. BERKOWITZ:  Yes, Your Honor.

17      I would just point out, counsel asserts the defendant is a

18  rapper, but on his rental application that was submitted to his

19  landlord at 60 East Monroe, he says he's an executive manager.

20  He's an executive manager.  Prior to that he worked as an

21  accountant.

22      You know, all we can tell, really, about this defendant is

23  he's a liar because he's not an accountant, he's not an

24  executive manager, and I'm not sure about the rapper part

25  either.

1    But, Your Honor, what we do know is that the defendant

2    does, on his Facebook page, on his own Facebook page -- and

3    this appears to be a picture from his own home, Ford No. 4 --

4    there's the defendant in his home with a gun right by his side.

5    Now, the defendant isn't saying these are props.  And

6    certainly to release the defendant back into his home when he

7    is posting on Facebook -- and that Facebook posting was in

8    2013.  And he's also got Facebook postings this year.  This is

9    just 35 weeks ago, Your Honor, for No. 6.  These are two guns

10   on granite countertop.  It looks very similar to the granite

11   countertop we saw in Ford No. 4.  These are postings from the

12   defendant.  Two guns.

13   The defendant is saying on his Facebook page he is

14   printing, "Kill cops.  Kill the feds."

15   Actually, maybe I should be very specific as to what he

16   says exactly.  This is his post:  "Fuck a cop.  Fuck a fed.

17   Fuck them all.  Kill them all."

18   I'm sorry, Your Honor, but the defendant has got that

19   posted on his Facebook page, Ford No. 1, and then he's also

20   posted on his Facebook page during this year that he's got

21   firearms that appear to be in his home.

22   Counsel is representing they're props, but, frankly, we

23   have no proof that that's the case.  They're guns that are

24   posted on his Facebook page, and he is not saying that they're

25   not real.

1        We know the defendant is a criminal.  We know he's a liar.

2   I don't know that you can rely on what this defendant

3   represents unless there's some serious conditions imposed on

4   him.  And simply letting him go without any conditions being

5   imposed on him, or determining whether or not there are

6   firearms in his home, I don't think is a responsible way to

7   deal with this defendant.

8        With respect to Mr. Cortez Stevens, he is -- every

9   indication is he's continuing to engage in criminal conduct.

10  The fact that he's got check stock, a large quantity of check

11  stock, check stock in the printer, the printer is hooked up to

12  a laptop.  Really, Your Honor, with someone who has no known

13  employment, there's no reason he would need check stock, but

14  that is consistent with his method of operation when he's

15  working with the rap boys.

16       He's continuing to engage in criminal conduct.  So if

17  these defendants might not have gotten arrested between the

18  first time we saw them in 2012 and today, that doesn't mean

19  that they weren't continuing to engage in criminal conduct, and

20  they don't pose a danger to the community, and we would ask

21  that these defendants be detained, or at the very least, Your

22  Honor, that there be some restrictions imposed on these

23  defendants regarding their Internet access and their use of

24  social media.

25       There is nothing in the bond report that has any

1    restrictions placed on either of these two defendants when it

2    is clear from the complaint and affidavit that these defendants

3    use social media, they use the Internet, they use computers to

4    engage in criminal conduct.  And we would ask at the very

5    least, Your Honor, in addition to any kind of detention or any

6    home detention for these defendants, that the Court impose

7    restrictions on their Internet use; that they be prevented --

8    that they are required to allow probation to have access to

9    their Facebook accounts whenever the probation officer wants;

10   that they are not allowed to open any other Facebook accounts

11   under any aliases; and that they are prohibited from opening

12   any other type of social media accounts in any other medium

13   during the -- during their supervision pretrial.

14        Short of putting these defendants in jail pending trial,

15   Your Honor, at the very least we would ask they be on some sort

16   of electronic monitoring because, clearly, they are engaging in

17   criminal conduct.  Maybe they're not going around dealing

18   drugs, but they are engaging in criminal conduct, and there

19   needs to be some record of where they are and what they're

20   doing during regular hours because all we could see them doing

21   right now is engaging in criminal conduct.

22             THE COURT:  Ms. Berkowitz, what are the -- again,

23   what is the minimum and maximum penalty for what they're -- the

24   complaint has?

25             MS. BERKOWITZ:  It's five years, Your Honor.

```
 1              THE COURT:  So zero to five years?

 2              MS. BERKOWITZ:  Correct.

 3              THE COURT:  Okay.

 4              MS. BERKOWITZ:  But as I pointed out, they have

 5    engaged in obstructive behavior previously, and the Court can

 6    take judicial notice of the search warrant and affidavit that

 7    was filed in 2012 relating to that conduct as we outline in the

 8    complaint in this case.

 9         You know, the defendants are using electronic medium.

10    They are using social media, and they need to have some

11    restrictions placed on them.  They cannot simply be released

12    under supervision, under no bond supervision.  That's just not

13    going to work for these defendants.

14              THE COURT:  May I have the exhibits?  Thank you.

15         Anything further, Ms. Berkowitz?

16              MS. BERKOWITZ:  No, Your Honor.

17              THE COURT:  All right.  Thank you.

18         Mr. King, anything further?

19              MR. KING:  Yes.

20              THE COURT:  Any further proffers?

21              MR. KING:  Yes.  A counter-proffer.

22              THE COURT:  You want to proffer and then also do

23    argument at the same time?

24              MR. KING:  Okay.  I'll proffer and then --

25              THE COURT:  Okay.  Thank you.
```

1          MR. KING:  The proffer is that the -- none of the

2    photographs, none of the photographs are from within the

3    defendant, Kevin Ford's, residence.  Kevin Ford's countertops

4    aren't even granite countertops.

5          Given that he was arrested in the early hours of Monday

6    morning at that residence, that is information that at least

7    was available to agents of the Government that affected the

8    arrest.  So suggesting that a linkage of guns to that residence

9    is simply, I'm suggesting, is not born out.

10         The Government, in their motion for both of these

11   individuals, first of all, is attempting to stand the Bail

12   Reform Act of 1987 on its head.  The starting point isn't

13   actually we lock people up because we're accusing them of

14   committing crimes.  It's -- constitutionally people are

15   entitled to a reasonable bail.

16         Now, Congress decided in 1987, in response to major drug

17   traffickers being able to, in South Florida and other venues,

18   to post literally millions and then walk away from it, to pass

19   the Bail Reform Act.  Its constitutionality has been upheld;

20   however, number one, the crime at issue here is not one of the

21   offenses that warrants a rebuttable presumption in favor of the

22   Government that there's no condition that can reasonably assure

23   appearance and safety.  That doesn't exist here.

24         They have the burden of proving, convincing this Court by

25   clear and convincing evidence that there's no combination of

1   conditions of release that's going to guarantee their

2   appearance or protect the safety of others.  And the notion

3   that the possibility exists of any description of some sort of

4   crime happening is what is meant in the Bail Reform Act by the

5   safety is a reach by the Government that's completely

6   inappropriate.  To permit that argument, they would be

7   warranted on any sort of suggestion of predictive behavior on

8   the part of anyone charged with anything in this system of

9   being able to be locked up without bond.

10       When they're talking about safety, (f)(2), it must be a

11   serious risk that the person will flee, or obstruct, or attempt

12   to obstruct justice, or threaten, injure, or intimidate, or

13   attempt to threaten or intimidate a prospective witness or

14   juror.

15       There is nothing in this record before you to suggest

16   they've even, even had a scintilla of evidence of that let

17   alone met their burden, and yet they're here trying to have you

18   lock these two young men up.

19       And whatever the circumstance that they argue with respect

20   to Ford, they're completely silent with respect to Mr. Stevens.

21       To have (inaudible) detain Mr. Stevens under these facts

22   is, quite frankly, bordering on abuse, abuse of government

23   authority under the Bail Reform Act.  It's just not right.

24       I mean, we can talk all we want.  Oh, it's -- you know,

25   should the Court agree and release them?  Oh, he's only been

1    locked up for two nights.

2        Who else here is going to volunteer to be locked up in

3    jail for two nights on the strength of what's been put in front

4    of you?

5        This is just wrong.  This is not appropriate.  The

6    suggestion that there's anything from that state court case in

7    Marshall County, Indiana, that I happen to represent them on,

8    that's evocative of any form of obstruction or attempted

9    obstruction, is absolute misrepresentation.

10        They got accused of a state crime.  They never once tried

11    to flee the jurisdiction.  They never once attempted in any

12    way, shape, or form to compromise the Government's case.  They

13    followed their counsel's advice.  A motion to suppress was

14    filed, which was, in my view, dispositive.  The evidence that

15    was conducted, the state court judge ruled against the

16    defendants.  They still maintained their obligations to that

17    Court up until the day the charges were dismissed.

18        They have no basis here for either of these individuals to

19    seek their continued detention pending trial.

20        They don't even have an indictment yet in this case.  They

21    don't even have an indictment yet in this case.  They want

22    these two young men to sit with no chance of liberty while they

23    get around the business of seeking an indictment from a grand

24    jury, and then the process of discovery, et cetera, et cetera,

25    begins.  It's just wrong.  There is no basis for detention of

1    either of these two young men.

2         Now, in terms of reasonable conditions -- there's still a

3    First Amendment in this country it strikes me.  And the

4    Government's suggestion of a blanket, "You can't get on social

5    media," social media is today's telephone from my generation.

6         Now, I'm open, and whatever the Court decides, but have it

7    be reasonable.  Have it be reasonable.

8              THE COURT:  What do you think would be reasonable?

9              MR. KING:  Well, what I think would be reasonable is

10   that they have the ability to open such accounts as they want

11   but to report to probation what the addresses are for them, and

12   to permit monitoring, monitoring because one of the standard

13   conditions of pretrial release is you not engage in any form of

14   criminal conduct.

15        And so it is within the purview of this Court to allow

16   pretrial services of the probation department to be able to go

17   on and have an assurance that no such conduct is taking place.

18   And if they believe there is probable cause to believe so, they

19   can file an appropriate petition in front of the Court.

20        That's reasonable.

21             THE COURT:  I mean, isn't that a lot of burden on the

22   probation department?  Well --

23             MR. KING:  I mean, to check.  I mean, it's --

24             THE COURT:  Well, but if in the case where this --

25   the allegation is there's false checks being deposited, and

1    there's a computer found in --

2            MS. BERKOWITZ:  Mr. Stevens.

3            THE COURT:  -- Mr. Stevens that has, you know, check

4    producing capabilities, so he's using the computer allegedly,

5    could be based on what he's charged with.  So if the Court

6    doesn't eliminate that, then how is the probation officer

7    supposed to go in and know if those are legitimate checks that

8    are being produced or not legitimate checks?  So how is the

9    probation office to know if that's not the instrumentalities of

10   some kind of continued criminal conduct, which we cannot be

11   allowing.

12           MR. KING:  I only had reference to the Government

13   asking the Court for a level of restriction on access to social

14   media.  That's the suggestion I had.

15           THE COURT:  Well, there's another aspect of that as

16   well, though, because it was the -- in the complaint, it was

17   using the social media that is alleged to lead to the

18   recruitment of others to engage in this credit card fraud and

19   this bank fraud.  So use of the social media was also, but that

20   can be cryptic at times.  And we really can't have a probation

21   officer in Chicago asking another district to be looking at

22   someone if they have to be concerned about whether or not all

23   the person's social media posts, or different accounts that

24   they may be opening, could potentially be -- I mean, you said

25   yourself they've been under investigation since 2012.  If these

 1    allegations are true, then there's been -- there's at least

 2    probable cause -- I'm going to find that there's probable cause

 3    to believe that these allegations are true.  So how am I

 4    supposed to just let them be out still using social media and

 5    then just say, "Well, it's up to the probation officer to check

 6    all the websites to see" -- how can I possibly assure that that

 7    isn't going to be going on possibly again if I don't say, "You

 8    can't use the social media, and you can't have the computer

 9    apparatus?"

10         Isn't that asking too much of the probation department?

11         So then if the probation department comes into the home

12    and, you know, they can see a gun.

13         You can't have the gun.

14         They can search.  We'll find the gun.

15         We can see a computer.  You can't have the computer

16    because that would allow you a link to social media.  It can be

17    erased -- they appear in clouds.  They're all over the place.

18    So once they have access to the social media, they could have

19    access to the criminal conduct again, and that's what we have

20    to -- that creates a danger.

21              MR. KING:  The only response to that is that --

22              THE COURT:  I mean, the First Amendment part of it,

23    the violent speech or whatever, someone might consider

24    distasteful.  I understand where you're coming from.  But the

25    fact of the matter is if they're going to be out on bond, how

1    do you -- when you've got possible criminal conduct also mixed

2    in with possible legitimate conduct, you can't ask the

3    probation department to be the police of that.  So the way we

4    (inaudible) is to have it removed.

5        So my question is:  If bond is going to be granted, will

6    the defendants agree to not have computer apparatus outside of

7    the reasonableness of having a phone and a texting on a

8    one-on-one basis so they can still communicate with people?

9            MR. KING:  If that's a condition of the Court, in its

10   wisdom determines is an appropriate condition, they're going to

11   comply with every order of the Court.  They don't want to be

12   locked up again.  So, yes.

13       I'm just suggesting, as we do this, we ask probation in a

14   lot of cases, most cases, to be not police, but to oversee,

15   drug test.  You know, you mentioned the not having a firearm.

16   And suggesting, one concept would be, if probation has the

17   ability at their -- based on their schedule to check social

18   media, that has a deterrent effect.  If the Court feels more of

19   a deterrent effect to avoid any continuation of questionable

20   conduct is necessary, well, that's the Court's prerogative to

21   decide.

22       But having --

23           THE COURT:  So I'm just asking of any suggestions

24   that you might have, which I think you've shared.  So you don't

25   have to share it more.

```
 1            MR. KING:  That's the only one I can think of.  I
 2   mean, I think it is legitimate under the facts of this case to
 3   have some monitoring.  If the Court feels it can't be done
 4   without the access you mentioned, you know, have a cell phone,
 5   and, you know, whatever, iPhone or whatever, then that's the
 6   way it is during the duration of this prosecution, but
 7   detention is completely inappropriate in this case.  It just
 8   is.
 9        The Government is not authorized by law to simply say,
10   starting out, starting out, after you get arrested for the
11   first time, you can't have any form of pretrial release because
12   we think you might do something bad in the future unless that
13   something bad is run away from the jurisdiction or do some
14   physical harm to somebody, do something harmful, or an
15   obstruction.
16        The generalized notion of, "Gee, you might do something,
17   anything bad in the future," that's not a legal basis for
18   detention, and that's why I'm complaining of the use of that
19   vehicle in this case.  I don't think it was appropriate.
20        Other reasonable conditions, great.  They don't want to be
21   locked up again.  I don't want to see them locked up again, and
22   we're open to it.
23        I've already mentioned the circumstance with regard to
24   Mr. Ford's residence.  We're proffering in good faith, in good
25   conscious.  Based on information I have, there are no weapons
```

1    in the house, and I don't have a particularly salient

2    suggestion for how we can verify that fact.  I mean, I'm happy

3    to do whatever I'm equipped to do in that regard, you know, but

4    go with somebody from law enforcement.  I don't know what else

5    I can do.

6        But I'm respectfully -- I don't disagree.  It's a pretty

7    low bar for probable cause.  I'm not disagreeing with the

8    Court's determination of probable cause to exist; however, I

9    do, on behalf of both of these defendants, suggest that

10   detention is not warranted.

11        THE COURT:  All right.  Thank you, Mr. King.

12       Any last word, Ms. Berkowitz?

13        MS. BERKOWITZ:  Your Honor, what the Government is

14   requesting, at least as far as social media access, is really

15   no different than telling a defendant you can't just, you know,

16   willy-nilly decide to change your address.  You know, you can't

17   just move around.

18       So the Internet is sort of like, you know, your apartment

19   in the sky.  It's your way of moving around in the social

20   system.  We're just asking that these defendants be monitored

21   because, really, it's a problem.

22        THE COURT:  Well, how would you suggest that they be

23   monitored?

24        MS. BERKOWITZ:  Well, as I indicated to the Court,

25   one thing to be done with them is to have the -- to have

1    probation be given complete and unfettered access at their will

2    to the defendants' Facebook account, Instagram accounts,

3    whatever social media they are presently, that we're aware of,

4    that they're using, and that they be prohibited from opening

5    any other social media accounts and any other aliases or names.

6    It's not an unreasonable request.  It's the least restrictive

7    request that can be made that allows the defendants to still,

8    to the extent it is truly necessary for them to use the

9    Internet, to use the Internet, but not to continue to engage in

10   criminal conduct, or at least so that it can be monitored by

11   probation as to what's going on in their legitimate use of it.

12        Certainly we would do that with pedophiles who access

13   pornography.  Although these defendants aren't pedophiles, they

14   are using social media in an illegal way, and they should be

15   monitored, and probation certainly has that ability to do that

16   in this case.

17        THE COURT:  Well, in the case of pedophiles and with

18   child pornography, then we take away completely their access to

19   the computer, and the Government here isn't suggesting

20   completely taking away the access as you would in those

21   circumstances.

22        MS. BERKOWITZ:  No, Your Honor.  And we never --

23        THE COURT:  By limiting no more opening of accounts

24   and then complete, inside the computer and from the outside of

25   the computer, monitoring ability from the probation department?

1          MS. BERKOWITZ:  Right, which would mean that the

2   defendants could not have privacy blocks on their Facebook

3   pages or anything else.

4      So that is the least restrictive way.  We're not saying

5   you can't have a Facebook page.  We're just saying it's going

6   to get monitored by probation.  And you can't put a privacy

7   block on there so that probation has to ask you to enter it, in

8   which case, you know, we might not be able to see what's going

9   on.

10          THE COURT:  Is that acceptable, Mr. King?

11          MR. KING:  Again, Judge --

12          THE COURT:  You'll accept anything that -- any

13   restrictions if they're not --

14          MR. KING:  Detained, yeah.

15          THE COURT:  All right.

16          MR. KING:  My objection is to detention.

17          THE COURT:  Okay.

18          MS. BERKOWITZ:  The other concern that we do have,

19   Your Honor, is there are postings by Kevin Ford with firearms.

20   They look pretty real, and he is posting very angry --

21   certainly a very clear position about the feds and about law

22   enforcement.  "Kill them."  The Government would be remiss if

23   we didn't bring that to the Court's attention and ask the Court

24   to make a decision as to whether or not that would need -- it

25   would be clear and convincing evidence that this defendant

1    poses a danger to the community.  Certainly we would take the

2    position that it does.

3         Clear and convincing evidence isn't beyond a reasonable

4    doubt.  It's slightly more than preponderance, but it's not

5    beyond a reasonable doubt.  It is certainly something worthy of

6    this Court addressing, the fact that this defendant is posting

7    photographs, multiple photographs over a period of years.  So

8    this isn't just one random photograph of the defendant with a

9    gun.  There are multiple photographs of this defendant with

10   guns, different guns, and a representation that we should kill

11   cops and kill the feds.

12        So there's a concern about releasing this defendant back

13   to his home where we believe there might be firearms.

14   Certainly we believe the photographs -- I don't know where

15   counsel is (inaudible) a representation it's not his home.  It

16   is my understanding that the law enforcement officers have

17   proffered that is a picture, a (inaudible) picture of his home,

18   his apartment at 60 East Monroe.  There are granite

19   countertops.  I believe that there is an article in which this

20   defendant extols the virtues of those granite countertops in a

21   rap magazine article.  So it appears that those photographs are

22   being taken in his home; that those guns may, in fact, be in

23   the home, and the Government is concerned about releasing this

24   defendant to his expressed desire to kill feds and kill cops

25   back to his home now that he's under -- there's been a

1  complaint issued, he's dealing with federal prosecution, and

2  release him back into his home unfettered with no restrictions.

3      These defendants have no known verifiable employment.

4  That's clear from these bond reports, Your Honor.

5      I would request, at the very least, they be on some sort

6  of electronic monitoring in addition to any restrictions that

7  are placed on their access to social media and the Internet and

8  use of computers.

9      THE COURT:  All right.  Thank you.

10      I'm going to take a break to look at these exhibits, and I

11  would also like to see the probation officers in my chambers.

12      (Break.)

13      THE COURT:  Okay.  The Court is going to order each

14  defendant released on $20,000 unsecured bond with conditions.

15  And each defendant -- those conditions will be the same for

16  both -- so, please, both of you listen up as I read these

17  conditions.

18      You will submit to supervision by and report for

19  supervision to pretrial services as directed.  You will each

20  continue or actively seek employment.  You will not obtain a

21  passport or other travel document.  You will abide by the

22  following restrictions on personal association, residence, or

23  travel:  With regard to Kevin Ford, the Northern District of

24  Indiana and the Northern District of Illinois.  With regard to

25  Cortez Stevens, the Northern District of Indiana.

1           MR. KING:  Judge, could I --

2           THE COURT:  Yes.

3           MR. KING:  His current employment, the automobile

4    sales, he periodically is called upon to travel into the

5    Northern District of Illinois because they purchase at

6    auctions.

7           THE COURT:  All right.

8           MR. KING:  And I apologize for not mentioning that

9    earlier.

10          THE COURT:  All right.  The Northern District of

11   Indiana and the Northern District of Illinois for both

12   defendants.

13      Avoid all contact, directly or indirectly, with any person

14   who is or may be a victim or witness in the investigation or

15   prosecution, including co-defendants.  Again, any medical or

16   psychiatric treatment, if deemed necessary, by pretrial

17   services.  Do not possess a firearm, destructive device, or

18   other weapon.  And it's not in here, but I'll say anywhere in

19   your possession, anyone that's riding in your car, anyone that

20   visits your house, anyone that you're associated with, no

21   weapons whatsoever.

22      Do not use any alcohol excessively.  Not use or unlawfully

23   possess a narcotic drug or other controlled substance defined

24   by 21 U.S.C. 802, unless prescribed by a licensed medical

25   practitioner.

1        Submit to testing for prohibitive substance as required by

2    the pretrial services officer or supervising officer.  Testing

3    may be used with random frequency, may include urine testing,

4    sweat patch, remote alcohol testing, or any other form of

5    prohibited substance screening or testing.  The defendant must

6    not obstruct, attempt to obstruct, or tamper with the

7    efficiency or accuracy of any prohibitive substance screening

8    or testing.

9        Report as soon as possible to the pretrial services office

10   or a supervising officer every contact with law enforcement

11   personnel, including arrests, questioning, or traffic stops,

12   and do not open any new credit cards or financial accounts or

13   lines of credit.  No access to any computers at all besides

14   cell phone, and no use of social media, and no social media

15   postings by yourself or by a third party on behalf of either of

16   the defendant.

17       Mr. Kevin Ford, do you understand these restrictions?

18           DEFENDANT FORD:  Yes, sir.

19           THE COURT:  Do you understand that if you violate

20   these restrictions in any way, that your bond could be revoked,

21   and you could owe the Government $20,000, and you could be then

22   incarcerated until trial?  Do you understand that?

23           DEFENDANT FORD:  Yes, sir.

24           THE COURT:  All right.

25       Mr. Cortez Stevens, do you understand these restrictions?

 1  The same question:  Do you understand that if you violate in

 2  any way any of these restrictions, then you could forfeit

 3  $20,000 to the Government, and you could and possibly probably

 4  would be held pending trial?  Do you understand that?

 5          DEFENDANT STEVENS:  (Inaudible.)

 6          THE COURT:  All right.  With regard to either of

 7  these cases, anything further from the Government?

 8          MS. BERKOWITZ:  Your Honor, the only concern I have

 9  is with respect to what we believe may be firearms in Kevin

10  Ford's home.  Is there any way that there could be an

11  inspection that's conducted?  Counsel goes through and assures

12  the probation department that there are no firearms there.  I

13  would hate probation to visit, and, you know, find firearms.

14          THE COURT:  Well, Mr. King, you have offered.  Can

15  you assure that?

16          MR. KING:  Can I assure that there are no guns in the

17  house?  I'm basing it on my client telling me, and I have --

18  this isn't somebody I met yesterday.  But I think I -- now,

19  he's got to get released, get his keys returned to him.  I can,

20  within --

21          MS. BERKOWITZ:  I believe Mr. King has the keys to

22  the defendant's apartment.

23          MR. KING:  I do?

24          MS. BERKOWITZ:  I believe we turned them over to you.

25          MR. KING:  Are these your keys?

1    Okay.  I do.

2    I could possibly, tomorrow or Saturday, go there.  I can't

3  do it this evening.

4         THE COURT:  Well, he's ordered to not have the

5  weapons.  I just don't think, even if Mr. King were to go now

6  and search the house and then, you know, somebody else were to

7  bring a gun, I can only order that he not have a gun.  And I

8  can -- and the probation office can go at any random time, but

9  they're not -- you know, their access is still very limited.

10  So just like with anyone else.

11    So even if Mr. King were to search the house today or

12  tomorrow or Saturday or Sunday, that doesn't mean -- so the

13  bond restriction has to be reasonable.

14         MS. BERKOWITZ:  That's fine, Your Honor.  The Court

15  makes whatever findings --

16         THE COURT:  The Court has made its order.  I

17  appreciate the -- I just don't -- I appreciate your suggestion.

18  I don't know that it accomplishes what your goal is long term

19  anyway.  So I'm not going to make that a request of Mr. King.

20    Anything further, Ms. Berkowitz?

21         MS. BERKOWITZ:  No, Your Honor.

22         THE COURT:  Anything further on this matter that

23  needs to be done at this time?

24         MS. BERKOWITZ:  No, Your Honor.

25         THE COURT:  Do we need to set this for a status

1    hearing/arraignment hearing?

2              MS. BERKOWITZ:  Yes.

3              THE COURT:  What would be a good day to do that?

4              MS. BERKOWITZ:  After the 20th of November.

5              THE COURT:  We have something set on November 21st.

6       I think earlier today we set some things, right, Pat?

7       For a status possible arraignment if an indictment is --

8    so, Mr. King, if you would check your calendar, and,

9    Ms. Berkowitz, yours as well.

10      So we're looking at November 21st at 10:30.

11             MS. BERKOWITZ:  That would be fine, Your Honor.

12             MR. KING:  10:30?

13             THE COURT:  Yes.

14             MR. KING:  That will be good.

15             THE COURT:  Okay.  So we'll set this for status

16   arraignment on November 21st, 2014, at 10:30 a.m.  Both

17   defendants are ordered to appear.

18      And, again, you're ordered to appear at all, of course,

19   all hearings; and if you don't, then that's another reason to

20   potentially have your bond revoked.

21      Anything further, Mr. King?

22      All right.  All right.  Thank you.

23      (Hearing concluded.)

24

25

1          CERTIFICATE OF REPORTER

2          I, Richard D. Ehrlich, a Registered Merit Reporter and

3    Certified Realtime Reporter, certify that the foregoing is a

4    transcript of the CD transcribed to the best of my ability.

5

6    s/Richard D. Ehrlich                    December 27, 2014
                                                                      _____
7    Richard D. Ehrlich, Official Reporter              Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25